<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NECHAMA LENCHITZ and AHARON LENCHITZ, on behalf of themselves and all others similarly situated,<br><br>                  Plaintiffs,<br><br>     v.<br><br>CENLAR FSB,<br><br>              Defendant. | Civil Action No. 22-07216 (GC) (DEA)<br><br><u>**MEMORANDUM OPINION**</u> |

<u>CASTNER, District Judge</u>

**THIS MATTER** comes before the Court upon Defendant Cenlar FSB's Motion to Dismiss (ECF No. 28) Plaintiffs Nechama and Aharon Lenchitz's Amended Complaint (ECF No. 22) pursuant to Federal Rule of Civil Procedure (Rule) 12(b)(6). Plaintiffs opposed, and Defendant replied. (ECF Nos. 33 & 34.) The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Cenlar's motion is **DENIED**.

## I.      BACKGROUND

### A.      Factual Background[1]

In February 2011, Plaintiffs took out a loan secured by a mortgage to finance their purchase

---

[1]      On a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded facts in the Amended Complaint. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

of a single-family home in Lakewood, New Jersey.  (ECF No. 22 ¶ 14; ECF No. 28-1 at 13-14.[2])

Under the agreement governing the Mortgage Loan, all payments "shall be applied to each Periodic

Payment in the order in which it became due.  Any remaining amounts shall be applied first to late

charges, second to any other amounts due under this Security Instrument, and then to reduce the

principal balance of the Note."  (ECF No. 22 ¶ 16.)

For their mortgage payments, Plaintiffs are also beneficiaries of the Housing Choice

Voucher (HVC) Homeownership Program, a federal homeownership assistance program of the

United States Department of Housing and Urban Development (HUD).  (*Id.* ¶ 18.)  The Lakewood

Township Residential Assistance Program (LTRAP) facilitates the HVC program at the local level,

providing Plaintiffs with funds to apply to their monthly mortgage payments.  (*Id.* ¶¶ 19-20.)

Cenlar is the current servicer of the Mortgage Loan.  (*Id.* ¶ 14.)  Because the HCV program

provides funds not only for mortgage loans, but also for costs incidental to home ownership such

as utilities, Plaintiffs' monthly funding from LTRAP "frequently *exceeds* the monthly amount due

on their Mortgage Loan."  (*Id.* ¶ 25.)  "LTRAP, in implementing the HVC program, gives Plaintiffs

the option to receive such funds directly, or alternatively, to have such funds disbursed to Cenlar

---

[2]     Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

Generally, a court may not consider matters extraneous to the pleadings when ruling on a motion to dismiss.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). But this Court may consider documents attached to a motion to dismiss if the documents' contents are referenced in the complaint and no party questions their authenticity.  *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002) (citation omitted).  Here, Cenlar attaches the following documents to its motion to dismiss: Plaintiffs' mortgage agreement and note (ECF Nos. 28-1 & 28-2), two monthly statements (ECF Nos. 28-3 & 28-4), Plaintiffs' letter to Cenlar dated October 28, 2021, and Cenlar's December 21 reply (ECF Nos. 28-5 & 28-6).  Plaintiffs refer to and rely on each of these documents in their Amended Complaint.  (*See, e.g.*, ECF No. 22 ¶¶ 16, 29-39, 49, 50.)  And in their opposition brief, Plaintiffs do not contest the authenticity of these documents.  (ECF No. 33 at 11 n.2.)  For these reasons, the Court finds that these documents are integral to the Amended Complaint and will consider them in ruling on Cenlar's motion to dismiss.

to pay down the Mortgage Loan principal, in excess of the monthly amount due." (*Id.* ¶ 26.) Each year, Plaintiffs have "consistently elected" the latter option. (*See id.* ¶¶ 21.) For at least eight years, when Cenlar received a payment from LTRAP that exceeded what Plaintiffs owed that month, Cenlar would apply the excess funds toward the principal balance of Plaintiffs' mortgage "in accordance with the Mortgage Loan agreement." (*Id.* ¶¶ 26-28.)

Leading up to 2021, Cenlar began sending Plaintiffs monthly statements that Plaintiffs allege were "blatantly false" and "reflected systemic failures in Cenlar's accounting." (*Id.* ¶ 29.) Cenlar's statements included delinquency notices that cited the "Overdue Amount" as "$0.00" and "unpaid" balances of negative amounts, which would ordinarily indicate "that Plaintiffs did not owe any payments on the Mortgage Loan, but to the contrary, had a credit in their favor." (*Id.* ¶¶ 30-31.) And recently, Cenlar has "significantly delayed — and has now altogether stopped — allocating excess payments toward paying down principal." (*Id.* ¶ 40.) Cenlar now "holds the excess cash it receives in an undisclosed account, with an undisclosed balance," in violation of the terms of the mortgage agreement. (*Id.* ¶¶ 41-42.) After repeated delinquency notices, Plaintiffs "called Cenlar many times," only to wait "'on hold' interminably," and to speak to representatives who "were consistently unable to explain to Plaintiffs why their account statements showed an 'Overdue Amount.'" (*Id.* ¶ 34.)

On October 28, 2021, Plaintiffs sent Cenlar a letter requesting that Cenlar correct various "accounting and servicing errors." (*Id.* ¶ 49.) Plaintiffs' letter specifically addressed Cenlar's (1) erroneous delinquency notices; (2) reports to credit reporting companies that Plaintiffs made late payments; (3) failure to credit excess payments from LTRAP to the principal balance of the mortgage; and (4) erroneous late fee charges, such as "a $34 fee in February or March 2021." (*Id.*; ECF No. 28-5 at 2-3.)

On December 21, Cenlar responded that it had "made the necessary request to have all adverse credit reporting corrected" and waived all late fees.  (ECF No. 28-6 at 2.)  But Plaintiffs allege that despite Cenlar's assurances, it continued to send Plaintiffs "false billing statements," failed to correct "faulty information" sent to credit reporting agencies, and failed to refund the $34.05 late fee.  (ECF No. 22 ¶¶ 84-86.)  Cenlar also refuses to allocate excess funds toward Plaintiffs' loan principal.  (*Id.* ¶ 87.)  Plaintiffs allege that they sent another letter dated March 26, 2022, addressing the unresolved issues, but Cenlar never responded.  (*Id.* ¶ 55.)

### B.    Procedural History

After Cenlar moved to dismiss Plaintiffs' original complaint, the parties agreed to allow Plaintiffs to file an amended complaint (ECF No. 21 ¶ 1), which Plaintiffs filed shortly thereafter. The Amended Complaint (ECF No. 22) brings the following claims: a violation of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2605 (Count I); violations of the New Jersey Consumer Fraud Act (NJCFA), N.J. Stat. Ann. § 56:8-2, *et seq*. (Counts II & V); tortious interference with Plaintiffs' mortgage loan agreement (Counts III and VI); and equitable accounting (Count IV).[3]  Cenlar's motion to dismiss followed.  (ECF No. 28.)

## II.    <u>STANDARD OF REVIEW</u>

On a motion to dismiss for failure to state a claim upon which relief can be granted, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'"  *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Directors of City of Scranton*, 975 F.3d 406,

---

[3]    The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state-law claims under § 1367(a).

412 (3d Cir. 2020)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)). When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 903 (3d Cir. 2021)). The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020).

## III.   **DISCUSSION**

### A.   **Count I — RESPA § 2605**

RESPA, 12 U.S.C. §§ 2601-2617, is "a consumer protection statute that regulates the real estate settlement process," and is meant to ensure that borrowers "are protected from . . . certain abusive practices" by real estate loan servicers. *Block v. Seneca Mortg. Servicing*, 221 F. Supp. 3d 559, 591 (D.N.J. 2016) (quoting *Jones v. ABN Amro Mortg. Grp., Inc.*, 606 F.3d 119, 124 (3d Cir. 2010)); 12 U.S.C. § 2601(a). Section 2605 of RESPA "imposes a duty upon loan servicers to respond to certain inquires by customer borrowers." *Hager v. CitiMortgage, Inc.*, Civ. No. 16-03348, 2017 WL 751422, at *4 (D.N.J. Feb. 27, 2017). If a loan servicer "receives a qualified written request [QWR] from the borrower . . . for information relating to the servicing" of a "federally related mortgage loan," the loan servicer must "make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction," or explain to the borrower why "the servicer believes the account of the borrower is correct" or "why the information requested is unavailable."

5

§ 2605(e)(1), (2)(A)-(C).  The loan servicer must respond to a QWR within thirty days after receipt. *Id.* at (e)(2).

To state a claim under § 2605, a plaintiff must sufficiently allege a violation of one of § 2605's obligations and "one of two types of damages: (1) actual damages to the borrower as a result of the failure to comply with § 2605; or (2) statutory damages in the case of a pattern or practice of noncompliance with the requirements of § 2605."  *Hager*, 2017 WL 751422, at *4 (quoting *Block*, 221 F. Supp. 3d at 592); *see also Giordano v. MGC Mortg., Inc.*, 160 F. Supp. 3d 778, 781 (D.N.J. 2016).  When alleging actual damages, plaintiffs must "establish a causal link between the financing institution's violation and their injuries."  *Hager*, 2017 WL 751422, at *4.

### 1. *Plaintiffs' First QWR*

Plaintiffs allege that they sent Cenlar their first QWR on October 28, 2021.[4]  In their letter, Plaintiffs "raised at least four separate issues" — that Cenlar sent inaccurate delinquency notices to Plaintiffs, improperly reported Plaintiffs as delinquent to credit reporting agencies, failed to allocate the excess portions of LTRAP's payments to Plaintiffs' loan principal, and failed to refund a $34.05 late fee.  (ECF No. 22 ¶¶ 79-80; ECF No. 28-5 at 2-3.)  Cenlar responded to this QWR on December 21, claiming that it had started the process of correcting "all adverse credit reporting" and waived all late fees.  (*See* ECF No. 28-6 at 2-3.)

But according to Plaintiffs, Cenlar never actually corrected the negative information sent

---

[4]   A QWR, in relevant part, must be in writing and state the borrower's reasons for believing that his or her account is in error.  § 2605(e)(1)(B).  Here, Plaintiffs have adequately alleged, and Cenlar does not contest, that (1) Plaintiffs' October 28, 2021 letter is a QWR under RESPA; (2) Plaintiffs' loan is a "federally related mortgage loan" within the meaning of § 2602; (3) Cenlar is a "servicer" of Plaintiffs' loan; and (4) the issues raised in the QWR related to the servicing of Plaintiffs' loan.  § 2605(e)(1)(A)-(B).  (*See* ECF No. 22 ¶¶ 77-79; ECF No. 28 at 21-22; ECF No. 28-5 at 2-3 (a copy of Plaintiffs' letter in which Plaintiffs identify their names and account number, and state why they believe their account to be in error).)

to credit reporting agencies or refunded the $34.05 late fee.  (ECF No. 22 ¶¶ 83, 86.)  These allegations, if true, implicate Cenlar's obligation under § 2605(e)(2)(A) to "make appropriate corrections in the account of the borrower."  *See Hutchinson v. Del. Sav. Bank FSB*, 410 F. Supp. 2d 374, 382-83 (D.N.J. 2006) (finding that plaintiffs alleged a RESPA violation where the loan servicer did not respond to the plaintiffs' QWRs and continued to report late loan payments to credit reporting bureaus).  Plaintiffs also assert that Cenlar's letter was "evasive and non-responsive" to Plaintiffs' other identified deficiencies, such as their request that Cenlar apply excess payments to the loan principal.  (*Id.* ¶¶ 50-51.)  Indeed, Cenlar's letter is silent on this issue. (ECF No. 28-6 at 2-3.)  Cenlar's alleged lack of response to this issue may constitute a breach of its obligation to either make corrections under § 2605(e)(2)(A), or explain in writing why its actions were correct under § 2605(e)(2)(B).  Thus, Plaintiffs have adequately alleged RESPA violations.  *See Hutchinson*, 410 F. Supp. 2d at 382 (noting that upon receipt of a QWR, a loan servicer must "take appropriate action with respect to the inquiry either by making corrections or providing a written explanation or clarification").

Plaintiffs have also sufficiently pled actual damages resulting from Cenlar's alleged breach of its duties under § 2605.  Plaintiffs allege that Cenlar did not "refund the $34.05 late fee it had debited from Plaintiffs in February 2021" despite its assurances in its letter that it would do so. (ECF No. 22 ¶ 86.)  Cenlar counters that "damages incurred prior to sending a QWR cannot sustain a claim under RESPA."  (ECF No. 28 at 24 (citing *Neilson v. Shapiro and DeNardo, LLC*, 2020 WL 13663835, at *5 (E.D. Pa. 2020)).)  But Cenlar's argument ignores the fact that Plaintiffs' QWR triggered "present RESPA obligations with respect to past error."  *See Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1246 (11th Cir. 2016).  Section 2605(e) "makes past errors current" by requiring servicers to fix past errors, such as erroneous late fees, "including by issuing refunds

as necessary" once the servicer is on notice of the error.  *See id.*  Here, Plaintiffs allege that Cenlar violated RESPA by failing to refund the $34.05 late fee *after* Plaintiffs had sent their QWR.  (*See* ECF No. 22 ¶ 86 ("Cenlar, after receiving Plaintiffs' [QWR], was obligated to refund the $34.05 late fee . . . [but] Cenlar failed to do so.").)  Thus, Plaintiffs were allegedly harmed as a result of Cenlar's violation of § 2605.  *Compare Renfroe*, 822 F.3d at 1246, *with Neilson*, 2020 WL 13663835, at *5 (finding that the plaintiff did not establish a causal connection between the costs of defending a foreclosure action and a servicer's failure to respond to the plaintiff's QWR, where the foreclosure action had been discontinued over a year before the plaintiff sent the QWR).

Cenlar further argues that Plaintiffs cannot assert the $34.05 late fee as damages because LTRAP submitted late payments, so the fees were justified.  (*See* ECF No. 34 at 9-10, 19.)  But this argument presents a question of fact that contradicts Plaintiff's allegation that "Cenlar was timely paid in full," and is thus inappropriate to decide at the motion to dismiss stage.  (ECF No. 22 ¶ 32.)  And if Cenlar's late payments were indeed justified, Cenlar was required under RESPA to explain in its December 21 letter that the late fee had been correctly imposed.  § 2605(e)(2)(B)(i).  But Cenlar did not explain to Plaintiffs that the $34.05 late fee was valid.  Instead, Cenlar replied that "all late fees have been waived on the loan," which Plaintiffs dispute.  (ECF No. 28-6 at 2; ECF No. 22 ¶ 86.)  Accordingly, Plaintiff has adequately pled actual damages with respect to the $34.05 late fee.

Plaintiffs have also adequately alleged that they suffered damages as a result of Cenlar's failure to respond to Plaintiffs' request that Cenlar allocate excess payments to Plaintiffs' loan principal.  (ECF No. 22 ¶¶ 22, 43-46.)  After Plaintiffs raised the issue in their QWR, Cenlar did not "take appropriate action . . . either by making corrections or providing a written explanation or clarification," *Hutchinson*, 410 F. Supp. 2d at 382, but continued to receive "payments exceeding

amounts due for more than a year," and "failed to allocate such excess funds to pay down principal as Plaintiffs had requested in their QWR." (ECF No. 22 ¶ 88.) Plaintiffs allege that the interest they currently owe "is higher than it otherwise would be, because interest is calculated as a percentage of the outstanding principal, which is higher than it should be as a result of Cenlar's conduct." (ECF No. 22 ¶ 43.) Cenlar's argument that it could hold excess funds in suspense for an indefinite amount of time is unavailing. Cenlar has not established that under these circumstances, as a matter of law, it needed to place LTRAP's excess funds in suspense for an indefinite amount of time, contrary to Plaintiffs' direct requests, the terms of the mortgage agreement, and Cenlar's previous eight-year practice of applying the excess payments to the loan principal. And even if Cenlar's actions were justified due to its general concern that "the housing authority could request repayment of the funds" (ECF No. 28 at 32), it needed to provide Plaintiffs "with a written explanation . . . of the reasons for which the servicer believes the account of the borrower is correct." §2605(e)(2)(B)(i). According to Plaintiffs, Cenlar did not do so here. Thus, Plaintiffs allege an ongoing harm as a result of Cenlar's violation of its obligations under § 2605.

### *2. Plaintiffs' Second QWR*

Plaintiffs allege that on March 26, 2022, they sent Cenlar a second QWR asking that Cenlar apply the excess portions of LTRAP's payments to Plaintiffs' loan principal, and that Cenlar failed to respond. (ECF No. 22 ¶ 55.) Cenlar claims that it has no record of receiving the second QWR, and argues that Plaintiffs needed to submit their QWR to Cenlar's designated address printed on Cenlar's monthly statements in order to trigger Cenlar's duties under RESPA. (ECF No. 28 at 29.) *See, e.g.*, *Purpura v. JPMorgan Chase*, Civ. No. 16-3765, 2017 WL 1250993, at *6 (D.N.J. Mar. 24, 2017) (dismissing a claim where plaintiff failed to mail his QWR to the servicer's designated address, and noting that to "aid servicers with the task of providing consumers with timely

information, RESPA's implementing regulations allow (but do not require) servicers to establish a designated address for QWRs" (citing 24 C.F.R. § 3500.21(e)(1))).  Here, Cenlar's monthly statements announce that all QWRs "must be directed" to a specific address — the same address to which Plaintiffs sent their first QWR.  (*See* ECF No. 28-3 at 2; ECF No. 28-5 at 2.)

Plaintiffs appear to concede that they sent their second QWR "to Cenlar's customer service address," and not Cenlar's "designated address" for QWRs.  (ECF No. 33 at 10.)  Though the decisions of the Second and Tenth Circuit and other district courts in this Circuit to dismiss on these grounds "may appear somewhat draconian, their reasoning is rational. . . . to make it feasible for servicers to comply with the quick turn-around time" imposed on servicers by RESPA. *Purpura*, 2017 WL 1250993, at *6 (first citing *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 182 (2d Cir. 2014); and then citing *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1149 (10th Cir. 2013)). But here, because Plaintiffs have sufficiently alleged that their first QWR triggered RESPA obligations, and that Cenlar violated its obligations resulting in actual damages, Count I of Plaintiffs' Amended Complaint survives Cenlar's motion to dismiss as a result of Plaintiffs' first QWR.

### 3.  *Statutory Damages*

RESPA allows borrowers to recover both actual damages resulting from § 2605 violations, as well as statutory damages "as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000."  § 2605(f)(1)(B).  Here, Plaintiffs assert both actual and statutory damages.  (ECF No. 22 ¶¶ 43, 86-88.)  Because the Amended Complaint need only assert either actual or statutory damages to survive a motion to dismiss, and Plaintiffs have plausibly asserted actual damages, the Court need not address the sufficiency of Plaintiffs' statutory damages allegation to deny Cenlar's motion to

dismiss as to Count I.  *See Palmer v. MGC Mortg., Inc.*, 2013 WL 6524648, at *6 (E.D. Pa. Dec. 10, 2013).

### B.      Count II — NJCFA

To state a claim under the NJCFA, a consumer must plead (1) an unlawful practice, (2) an ascertainable loss, and (3) a causal relationship between the two.  *Gonzalez v. Wilshire Credit Corp.*, 25 A.3d 1103, 1115 (N.J. 2011).  The NJCFA is intended to "be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud," and therefore is "liberally construed in favor of the consumer."  *Id.* (citations omitted).

The NJCFA prohibits, in relevant part, "any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, [or] misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance" thereof.   N.J. Stat. Ann. § 56:8-2.  "Unlawful practices fall into three general categories: affirmative acts, knowing omissions, and regulation violations.  The first two are found in the language of N.J.S.A. 56:8-2, and the third is based on regulations enacted under N.J.S.A. 56:8-4."  *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994).  When the alleged unlawful conduct consists of an affirmative act, "intent is not an essential element and the plaintiff need not prove that the defendant intended to commit an unlawful act."  *Id.* (citing *Chattin v. Cape May Greene, Inc.*, 591 A.2d 943 (N.J. 1991) (Stein, J. concurring)).

For Plaintiffs' NJCFA claim, the alleged unlawful conduct is Cenlar's "unconscionable" refusal "to allocate excess funds to pay down loan principal."  (ECF No. 22 ¶¶ 93-94.)  Because unconscionable commercial practices are considered "affirmative acts," "NJCFA claims alleging unconscionable commercial practice as the unlawful activity do not require a showing of 'intent to deceive' or 'knowledge of the falsity of the representation.'"  *Katz v. Ambit Northeast, LLC*,

Civ. No. 20-1289, 2021 WL 2680184, at *7 (D.N.J. Jun. 29, 2021) (citation omitted).[5]  Though

the NJCFA does not define "unconscionable commercial practice," the term "is not without limits.

The standard of conduct that the term 'unconscionable' implies is lack of good faith, honesty in

fact and observance of fair dealing." *Ciser v. Nestle Waters North Am. Inc.*, 596 F. App'x 157,

161 (3d Cir. 2015) (citing *Cox*, 647 A.2d at 462 (internal citations omitted)).  "Most importantly,

the New Jersey Supreme Court has instructed that '[t]he *capacity to mislead is the prime ingredient*

of all types of consumer fraud.'" *Id.* (citing *Cox*, 647 A.2d at 462.)  Thus, to constitute an

unconscionable business practice under the NJCFA, the business practice must be capable of

misleading consumers and "stand outside the norm of reasonable business practice in that it will

victimize the average consumer." *Katz*, 2021 WL 2680184, at *8.  Courts "have dismissed CFA

complaints for failure to state a claim where plaintiffs have failed to allege that the defendant

engaged [in] conduct that could be considered misleading within the meaning of the Act." *Hassler

v. Sovereign Bank*, 644 F. Supp. 2d 509, 515 (D.N.J. 2009) (collecting cases); *Katz v. Live Nation,

Inc.*, Civ. No. 09-3740, 2010 WL 2539686, at *6 (D.N.J. Jun. 17, 2010) (finding that a concert

venue imposing unexplained fees within ticket sales, such as parking fees without regard to the

purchaser's mode of transportation, had a capacity to mislead consumers and evinced a lack of fair

dealing sufficient to be unconscionable under the NJCFA); *Ciser*, 596 F. App'x at 160-61 (finding

that an alleged unconscionable practice requires some element of deceptive conduct, explicit or

implicit, to be actionable as an unconscionable practice).

Accordingly, the key issue is whether Cenlar's holding of "significant" portions of LTRAP

payments in "unidentified accounts at undisclosed balances" without allocating excess funds

---

[5]      Accordingly, "the heightened pleading standard of Rule 9(b) does not apply." *Katz*, 2021
WL 2680184, at *7 (citation omitted).

towards Plaintiffs' loan principal, as Plaintiffs allege (ECF No. 22 ¶ 94), has "a capacity to mislead consumers" and evinces "a lack of fair dealing" within the meaning of the NJCFA. *Katz v. Live Nation*, 2010 WL 2539686, at *6. Given the broad remedial purpose of the NJCFA, and accepting all of Plaintiffs' allegations as true and drawing all reasonable inferences in Plaintiffs' favor, the Court finds that Plaintiffs have pled facts sufficient to evince the type of implicit deceptive element required under the NJCFA. Plaintiffs allege that Cenlar began allocating the excess portions of LTRAP's payments to "an undisclosed account" without explanation, after having consistently allocated such excess payments toward the loan principal for "over a period of at least eight years." (ECF No. 22 ¶¶ 28, 45-46.) "Anyone looking at a recent standard monthly invoice from Cenlar would have no way of ascertaining the balance of excess unallocated funds Cenlar holds, nor the identity of any account in which such funds are held."[6] (*Id.* ¶ 47.) And Plaintiffs allege that Cenlar never provided a satisfactory explanation for its refusal to allocate excess funds to the loan principal, despite Plaintiffs' letters and "many" phone calls. (*Id.* ¶¶ 34, 49, 55, 85-88.) Plaintiffs have alleged sufficient facts indicating that Cenlar's refusal to allocate excess funds towards Plaintiffs' principal, without explanation or a clear accounting of the excess funds, had the capacity to mislead Plaintiffs as to how their entitled LTRAP funds were being applied. The Court should not resolve the question of whether Cenlar's behavior plausibly stood "outside the norm of reasonable business practice" on a motion to dismiss. *See Hassler*, 644 F. Supp. 2d at 514 ("Often, the determination of whether business conduct 'stand[s] outside the norm of reasonable business

---

[6]     Cenlar claims that its monthly statements "contained a balance of the excess LTRAP funds being held in suspense which was listed in the 'other' column in the 'Past Payments Breakdown' 'Paid Year to Date' section." (ECF No. 33 at 31 (citing ECF No. 28-3).) Plaintiffs contest that the figure in that column is "the balance of the suspense account." (ECF No. 33 at 32.) The Court must accept Plaintiffs' allegation as true, and the monthly statement submitted by Cenlar supports Plaintiffs' claim that it does not label the funds held in suspense or identify the suspense account. (ECF No. 22 ¶ 47.)

practice' presents a jury question.").

Finally, Plaintiffs have sufficiently pled an ascertainable loss that is causally connected to Cenlar's business practice, in that Plaintiffs' loan principal is "higher than it should be as a result of Cenlar's conduct" resulting in Plaintiffs owing more interest.  (ECF No. 22 ¶ 43.)  *See also Johnson v. Novastar Morg., Inc.*, 698 F. Supp. 2d 463, 472-73 (D.N.J. 2010) (finding that a plaintiff who has sufficiently alleged violations and damages under RESPA also sufficiently alleged an ascertainable loss as a result of allegedly unlawful conduct under the NJCFA).  Thus, Cenlar's motion to dismiss is denied as to Count II.

Plaintiffs' NJCFA claim in Count V survives for the same reasons.  Plaintiffs allege that Cenlar engaged in fraudulent conduct by labeling Plaintiffs' loan as "delinquent" and charging late fees, "even though the balance due was zero or negative."  (ECF No. 22 ¶¶ 127-128.)  On at least one occasion, Cenlar allegedly charged a $34.05 late fee when it had been "timely paid in full,"[7] and Cenlar never refunded the fee.  (*Id.* ¶¶ 32, 38, 86.)  Plaintiffs' allegations are minimally sufficient to state a claim that LTRAP's "payments were misappropriated to fees" in a manner that had the capacity to mislead in violation of the NJCFA, and that Plaintiffs suffered an ascertainable loss "in the amount the loan balance was not reduced."  *See Schmidt v. Wells Fargo Bank, N.A.*, Civ. No. 17-1708, 2018 WL 7550261, at *2 (D.N.J. Nov. 30, 2018).

### C.    Count III — Tortious Interference

To plead a claim of tortious interference, Plaintiffs must plausibly allege (1) an existing contractual relationship, (2) intentional and malicious interference with that relationship, (3) loss

---

[7]     Cenlar asserts that LTRAP sometimes "sends in payments after the 15th of the month," so any late fees that were not subsequently waived were not "wrongful."  (ECF No. 28 at 38.)  Again, because the Court accepts as true all well-pleaded facts in the Amended Complaint, Cenlar's factual argument is inappropriate to resolve at the motion-to-dismiss stage.  *See Fowler*, 578 F.3d at 210.

or breach of a contract as a result of the interference, and (4) damages resulting from the interference. *DiGiorgio Corp. v. Mendez and Co., Inc.*, 230 F. Supp. 2d 552, 558 (D.N.J. 2002) (citing *Printing Mart-Morristown v. Sharp Elec. Corp.*, 563 A.2d 31, 37 (N.J. 1989)). Under New Jersey law, "intentional interference" exists where the actor has "specific knowledge of the contract right upon which his actions infringe," and "knows that the interference is certain or substantially certain to occur as a result of his action." *Id.* (citing *Restatement (Second) of Torts*, § 767 (1979)). Further, "'malice' does not necessarily require 'ill will,' but rather means that the harm was inflicted by the defendant without justification or excuse." *Id.* (citing *Printing Mart-Morristown*, 563 A.2d at 37).

Here, there is no dispute that Plaintiffs' mortgage agreement is a valid contract. (ECF No. 22 ¶ 105; ECF No. 28 at 33-35.) Plaintiffs allege that the agreement permits Plaintiffs to pre-pay their loan principal, and requires that "all payments accepted and applied by the Lender . . . shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note." (ECF No. 22 ¶ 16.) By refusing to allocate excess funds to pay down the loan principal, Cenlar applies Plaintiffs' LTRAP funds in a manner that breaches the terms of Plaintiffs' mortgage agreement. (*Id.* ¶ 103.) Thus, Plaintiffs have sufficiently alleged a breach of the terms of the mortgage agreement as a result of Cenlar's actions. Plaintiffs have also sufficiently alleged damages caused by the breach for the same reasons in their RESPA and NJCFA claims.

Cenlar argues that Plaintiffs have not established that Cenlar purposefully interfered with the terms of the mortgage agreement. (ECF No. 28 at 34.) But even so, a plaintiff can establish tortious interference where "the actor does not act for the purpose of interfering with the contract

or desire it but knows that the interference is certain or substantially certain to occur as a result of his action." *Digiorgio*, 230 F. Supp. 2d at 564 (citing *Restatement (Second) of Torts*, § 766, comment j (1979)).  Here, Plaintiffs allege that Cenlar knew that the mortgage agreement required it to allocate excess payments to the loan principal; it acted in accordance with that provision for years; and then it began allocating excess funds to an undisclosed account without a satisfactory explanation.  (ECF No. 22 ¶¶ 28, 45-46.)  Cenlar argues that its receipt of excess funds violated "HUD guidelines," and Cenlar was therefore justified in "placing those funds in suspense pending instruction from HUD as HUD could request reimbursement of the excess funds."  (ECF No. 28 at 34-35 (citing 24 C.F.R. § 982.635(d)(2) ("If the assistance payment exceeds the amount due to the lender, the PHA must pay the excess directly to the family."))).)  But Cenlar has not established as a matter of law that this guideline required Cenlar to hold the funds in suspense indefinitely rather than apply them to the principal pursuant to the terms of the mortgage agreement. Accordingly, at this stage, Plaintiffs have sufficiently pled a claim of tortious interference under Count III.

For the same reasons, Plaintiffs have also sufficiently stated a tortious interference claim in Count VI.  (ECF No. 22 ¶¶ 136-140.)  Plaintiffs allege that Cenlar interfered with the loan agreement by charging late fees when no late payments had been made and "Cenlar was timely paid in full." (*Id.* ¶ 31-32.)  These incorrect late fees "constitute a violation of the governing HVC Mortgage Loan agreement" between Plaintiffs and the lender, and damaged Plaintiffs by applying LTRAP funds to late fees instead of monthly payments.  (*Id.* ¶¶ 137-139.)  Cenlar's argument that it had in fact received late payments and waived some late fees is a question of fact that cannot be

resolved at this stage.  Thus, Cenlar's motion to dismiss Count VI is denied.

### D.     Count IV — Equitable Accounting

A court may order equitable accounting upon any of the following three grounds: "(1) the existence of a fiduciary or trust relation; (2) the complicated nature or character of the account; and (3) the need for discovery."  *Coldwell Banker Real Estate, LLC v. Bellmarc Grp. LLC*, 2021 WL 4129492, at *9 (D.N.J. Sep. 9, 2021), *aff'd*, 2022 WL 3644183 (3d Cir. Aug. 24, 2022) (citing *Onderdonk v. Presbyterian Homes of N.J.*, 425 A.2d 1057, 1062 n.4 (N.J. 1981)).  "The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is . . . the absence of an adequate remedy at law."  *Rainbow Apparel, Inc. v. KCC Trading, Inc.*, Civ. No. 9-5319, 2010 WL 2179146, at *6 (D.N.J. May 26, 2010) (quoting *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962)).

Here, Plaintiffs alleged that Cenlar is "holding significant cash" belonging to Plaintiffs "in unallocated and unidentified accounts with undisclosed balances."  (ECF No. 22 ¶ 117.)  Cenlar claims that its monthly statements attached to its motion to dismiss show that the excess LTRAP funds being held in suspense are listed "in the 'other' column," referencing Plaintiffs' May 17, 2021 statement as an example.  (ECF No. 33 at 31 (citing ECF No. 28-3).)  But the monthly statement does not, on its face, clearly indicate that the "-$1,718.00" listed in the "other" column on the May 17, 2021 statement represents the suspended excess LTRAP funds.  (*See* ECF No. 28-3 at 2.)  The monthly statement therefore does not contradict Plaintiffs' assertion that "[a]nyone looking at a recent standard monthly invoice from Cenlar would have no way of ascertaining the balance of excess unallocated funds Cenlar holds."  (ECF No. 22 ¶ 47; ECF No. 33 at 31-32 (Plaintiffs assert that "-$1,718.00" was not the balance of the suspense account as of May 17, 2021).)  Thus, regardless of whether contracts commonly used by homeowners such as mortgage

loan agreements are typically the type of "complicated" accounts that require an equitable accounting, Plaintiffs have sufficiently alleged facts that may justify an equitable accounting of the balance of excess funds from LTRAP that Cenlar has placed in suspense. *See also D'Angelo v. Ocwen Loan Servicing, LLC*, 2017 WL 712781, at *9 (N.J. Super. Ct. App. Div. Feb. 23, 2017) (finding that a plaintiff sufficiently stated a valid claim for an accounting where the plaintiff alleged that they did not receive proper credit for mortgage payments "over a lengthy period of time" and defendants failed to pay real estate taxes funded by plaintiff's mortgage payments).

## IV.   CONCLUSION

For the foregoing reasons, Cenlar's motion to dismiss (ECF No. 28) is **DENIED**.   An appropriate Order follows.

Dated: March 11, 2024

_____
**GEORGETTE CASTNER**
**UNITED STATES DISTRICT JUDGE**